UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| EMLYN COAL PROCESSING, LLC, | Case No. 11-61483 |
| Debtor. | Honorable Joseph M. Scott, Jr. |

**EMERGENCY MOTION OF DAVID N. KLOEBER, JR. FOR AN ORDER
(A) DISMISSING THE DEBTOR'S CHAPTER 11 CASE FOR
LACK OF AUTHORITY PURSUANT TO 11 U.S.C. § 1112(b) OR,
ALTERNATIVELY, (B) APPOINTING A CHAPTER 11 TRUSTEE**

David N. Kloeber, Jr. ("Kloeber"), secured lender of Emlyn Coal Processing, LLC (the "Debtor"), by his undersigned counsel, **FROST BROWN TODD LLC**, files this motion (this "Motion") for the entry of an order (A) dismissing the Debtor's chapter 11 case for lack of authority pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code") or, alternatively, (B) appointing a Chapter 11 Trustee pursuant to section 1104(a) of the Bankruptcy Code.  In support of this Motion, Kloeber respectfully states:

**BACKGROUND**

A.    **General Background**

1.     On November 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[1] Also on November 4, 2011, Montie's Resources, LLC ("Montie's") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[1] As more fully discussed herein, the Debtor did not have authority to file bankruptcy.

2.      In July of 2007, Kloeber and Bart J. Montanari ("Montanari") entered into a business transaction wherein Kloeber agreed to finance the purchase of the Debtor who owned the tipple in Whitley county and certain reserves.  Additionally, Kloeber extended a $500,000 line of credit to the Debtor to facilitate operating cash flow.  As part of the transaction, Kloeber and Montanari each owned 50% of the Debtor.

3.      Montanari was charged with operating the Debtor, acquiring, mining, processing and selling coal and Kloeber (through his staff) handled the day to day accounting for the Debtor, such as payroll, taxes and bill payment. By September of 2007, the Debtor was beginning to experience cash shortages due to a lack of coal production.  In November of 2007, a board meeting of the Debtor was called to discuss financial conditions and operations.  The existing Notes were both in default at that time and a plan was put in place to improve operations and Kloeber agreed to increase the credit line.

4.      While the Debtor operated successfully for a time, in April of 2008, additional capital improvements were needed to increase and/or improve operations, so Kloeber agreed to personally guaranty an additional working capital loan from Alliance Bank secured by receivables of the Debtor.  As volumes of coal processed by the tipple began to increase, yields on the coal being processed was only 52% to 57%, far less than the projected 75% to 80% yields represented by Montanari.

5.      Beginning in April of 2008, Kloeber made a series of equipment acquisition loans to Montie's in effort to increase the production available to be processed at the tipple.  In September of 2008, Kloeber again increased the Emlyn credit line to allow the Debtor to acquire additional reserves in Owsley County.  Despite virtually unlimited funding, access to the necessary equipment, coal reserves and tipple, neither the Debtor nor Montie's were operating at

a sufficient profit to allow for payment of debt service, thereby leaving them in continual default of their obligations to Kloeber.

6.      In November 2008, Montanari felt he was positioned to successfully operate the Debtor on his own and requested to purchase Kloeber's interest in the Debtor as more fully reflected on that certain term sheet date November 18, 2008 attached hereto as Exhibit A.  In January of 2009, the parties consummated the purchase of Kloeber's interest in the Debtor which Kloeber agreed to finance.  Kloeber's office transferred all books, records and accounting functions to Montanari in January 2009 as part of this transaction.

7.      The parties also entered into the Loan Modification Agreement to reflect the parties' terms regarding repayment of the obligations owed to Kloeber. As part of those terms, the parties agreed that all interest payments were deemed current as of execution with the first principal payment due March of 2009.  However, despite Montanari's belief that the Debtor and/or Montie's were going to cash flow, the first principal payment was missed in March of 2009 and there were no additional payments prior to the Forbearance Agreement.  As early as May of 2009, the Debtor had numerous non-monetary defaults for its failure to pay various withholding and coal severance taxes.

8.      In September of 2009, Kloeber retained Kentucky counsel to start foreclosure proceedings against the Debtor, Montie's and the guarantors which culminated in the Forbearance Agreement executed in May of 2010.  While the Debtor made some of the required payments under the Forbearance Agreement, by December of 2010, the Debtor was in default of its payment obligations under the Forbearance Agreement, and never made any further payments to Kloeber on his outstanding obligations.  Upon information and belief, throughout the Debtor's failure    to    make    payments    to    Kloeber    as    well    as    the    taxing    authorities,

Montanari continued to draw at least $50,000 per month for his personal use through a Minnesota limited liability company named Bella Luca Properties, LLC. In fact, a $25,000 wire transfer was made from the Debtor's account to Bella Luca Properties, LLC on the eve of the bankruptcy filing.

9.     Kloeber is a secured creditor of the Debtor. Through various loan documents the Debtor, along with Montie's, Bart J. Montanari, Lisa Montanari, and The Bartolomea and Lisa Montanari Family Limited Partnership (collectively, the "<u>Obligors</u>"), is indebted to Kloeber in the principal amount of $11,574,775.00, with additional interest owed in the amount of $717,607.23 through September 30, 2011, with interest thereon continuing to accrue daily, plus late charges, plus cost of collection and attorneys' fees (the "<u>Indebtedness</u>"). The Indebtedness is secured by substantially all of the assets of the Debtor and Montie's (the "<u>Collateral</u>").

**B.     <u>The Unauthorized Bankruptcy Filing</u>**

10.     On November 4, 2011 (the "<u>Petition Date</u>"), Bart J. Montanari ("<u>Montanari</u>"), purportedly acting as the President of the Debtor, signed the voluntary petition on behalf of the Debtor. In addition, on the Petition Date, the Debtor filed a certain document entitled *Emlyn Coal Processing, LLC Minutes of the Meeting of Directors October 19, 2011* (the "<u>Purported Resolution</u>") (Docket No. 3), which was allegedly executed by Montanari "in his capacity as the Sole Member of the Company, for and on behalf of the Company." *See* Purported Resolution.

11.     The Purported Resolution, which was dated October 19, 2011, provides, among other things, that "Bart Montanari, in his capacity as an officer and sole member, is hereby authorized to execute and deliver all documents necessary to perfect the filing of a Chapter 11 bankruptcy case on behalf of the Company." *See* Purported Resolution ¶ 3. However, as described in greater detail below, as of the Petition Date, Montanari no longer served as a Governor, officer

and/or employee of the Debtor.  Moreover, as of the Petition Date, Montanari no longer possessed any voting and other consensual rights with respect to his membership interests in the Debtor.

12.     Prior to the Petition Date, Montanari, as the sole member of the Debtor, and Kloeber entered into that certain Pledge Agreement dated January 16, 2009 (the "Pledge Agreement", a copy of which is attached hereto and incorporated herein as Exhibit B).    Pursuant to the Pledge Agreement, Montanari, among other things, pledged all of his units and any other membership interests in and to the Debtor, representing one hundred percent of the aggregate membership units of the Debtor, to Kloeber.  *See* Pledge Agreement § 2.

13.     Section 6 of the Pledge Agreement provides, among other things, that "[u]pon the occurrence and during the continuance of any Event of Default, [Kloeber] shall have the right in his sole discretion, and [Montanari] shall execute and deliver all such proxies and other instruments as may be necessary or appropriate to give effect to such right, to terminate all rights of [Montanari] to exercise or refrain from exercising the voting and other consensual rights that [Montanari] would otherwise be entitled to exercise pursuant to Section 6(a) hereof, and all such rights shall thereupon become vested in [Kloeber] who shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights…" *See* Pledge Agreement § 6(d).

14.     Pursuant to section 11 of the Pledge Agreement, the following occurrences constitute an Event of Default under the Pledge Agreement:

> (a) the failure of [Montanari] to pay when due any of the Obligations; (b) the failure of [Montanari] to perform any agreement of [Montanari] contained herein, in the Note or in any other agreement with [Kloeber]; (c) any statement, representation or warranty of [Montanari] made herein or at any time furnished to [Kloeber] is untrue in any respect as of the date made; (d) the entry of any judgment against [Montanari]; (e) [Montanari] becomes insolvent or is generally not paying his debts as they become due; (f) the appointment of or assignment to a custodian, as that term is defined in the United States Bankruptcy Code, for any property of [Montanari], or encumbrance, levy, seizure or attachment of any portion of the Collateral; (g) the commencement of any proceeding or the filing of a petition by or against

[Montanari] under the provisions of the United States Bankruptcy Code for liquidation, reorganization or adjustment of debts or under any insolvency law or other statute or law providing for the modification or adjustment of the rights of creditors; (h) the failure of [Montanari] to obtain a release of [Kloeber] from his guaranties given in connection with the Guarantied Obligations on or before the Release Date; or (i) dissolution, consolidation, or merger, or transfer of a substantial part of the property of [Montanari].

*See* Pledge Agreement § 11.

15.     As described above, an Event of Default had occurred and is continuing under the Pledge Agreement.  Accordingly, by letter dated November 3, 2011, Kloeber provided written notice that Kloeber was exercising his rights under the Pledge Agreement (the "November 3rd Notice", a copy of which is attached hereto and incorporated herein as Exhibit C).

16.     The November 3rd Notice provides, among other things, that: (i) an Event of Default currently exists and continues under the Pledge Agreement; (ii) Kloeber has elected to exercise and is exercising his right under section 6 of the Pledge Agreement to terminate all of Montanari's rights to exercise or to refrain from exercising voting and other consensual rights; (iii) all such voting and other consensual rights are vested in Kloeber under the authority of section 6 of the Pledge Agreement; and (iv) Montanari is specifically prohibited from exercising any further voting rights associated with his membership interests, as Kloeber is now exercising those rights.

17.     In addition, pursuant to the November 3rd Notice, and as set forth in that certain *Emlyn Coal Processing, LLC Combined Written Action of David N. Kloeber, Jr., Acting Pursuant to Section 6 of the January 16, 2009 Pledge Agreement and of the Governors* dated November 3, 2011 (the "November 3rd Written Action", a copy of which is attached hereto as Exhibit D), Kloeber provided notice that: (i) Kloeber is acting, pursuant to his authority to vote the membership interest, to terminate Montanari as a Governor of the Debtor; (ii) Kloeber has been appointed as the sole Governor of the Debtor; (iii) Bruce A. Smith has been elected as the Chief Manager/President and

Treasurer of the Debtor; and (iv) Montanari has been terminated as an officer and employee of the Debtor.

18.     Despite Kloeber having exercised his rights under the Pledge Agreement, Montanari, purportedly acting as the President of the Debtor, and in contravention of the Pledge Agreement and the rights granted to Kloeber thereunder, signed the voluntary petition on behalf of the Debtor.  Moreover, seemingly as an attempt to evade Kloeber's exercise of his rights under the Pledge Agreement, the Debtor filed the invalid Purported Resolution.  However, the Purported Resolution is of no effect since as of the bankruptcy filing Montanari no longer served as Governor, officer and/or employee of the Debtor, nor did Montanari possess any voting and or other consensual rights with respect to his membership interest in the Debtor.

## JURISDICTION

19.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  The statutory predicates for the relief sought in this Motion are 11 U.S.C. § 1112(b), and in the alternative, 11 U.S.C. § 1104(a).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

20.     By this Motion, Kloeber seeks the entry of an order by this Court: (i) dismissing the Debtor's chapter 11 case under section 1112(b) of the Bankruptcy Code, or alternatively, (ii) appointing a Chapter 11 Trustee in this case pursuant to section 1104(a) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

**A.     This Court Must Dismiss the Chapter 11 Case Because Montanari Lacked Authority to File the Bankruptcy Petition**

21.     Section 1112(b)(1) of the Bankruptcy Code provides that:

Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

22.     Section 1112(b)(4) of the Bankruptcy Code provides a list of circumstances that the term "cause" includes for purposes of section 1112(b)(1) of the Bankruptcy Code, however, the list is not limiting and may include additional factors warranting dismissal. *See* 11 U.S.C. § 102(3) (providing the rule of construction for the use of "includes" in the Bankruptcy Code).

23.     One of the non-enumerated grounds for dismissal under section 1112(b) of the Bankruptcy Code is a lack of good faith. *See Trident Assoc. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assoc. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995); *cf. Marrama v. Citizens Bank of Mass.*, 127 S. Ct. 1105, 1110-11 (2007) (noting that the nonexclusive list of causes justifying dismissal under § 1307(c) does not mention bad faith but recognizing that dismissal for bad-faith is implicitly authorized by the words "for cause" in that section).

24.     As discussed in further detail below, the Debtor's voluntary petition was filed in bad faith, constituting reason alone for this Court to dismiss the Debtor's chapter 11 case for "cause" under section 1112(b) of the Bankruptcy Code.

25.      Based upon the circumstances surrounding the filing of this chapter 11 case, it appears that the Debtor's sole purpose for filing this chapter 11 case was to hinder, delay and otherwise frustrate the ability of Kloeber to enforce his bargained for rights with respect to his collateral under applicable law and the Loan Documents.  Montanari's unauthorized signing of the voluntary petition and the Debtor's filing of the Purported Resolution shortly after Kloeber

8

exercised his rights under the Pledge Agreement clearly demonstrates that the filing of this chapter 11 case was not done in good faith.

26.     The Debtor has recognized in the Debtor's *Motion for Interim Use of Cash Collateral* (the "Cash Collateral Motion") (Docket No. 9) that Kloeber has asserted his rights under the Pledge Agreement.  Specifically, the Debtor states in the Cash Collateral Motion that Kloeber "has attempted to assert control over Emlyn by claiming the ability to exercise governance rights under a pledge of the membership interests in Emlyn." *See* Cash Collateral Motion ¶ 8.

27.     The Debtor has also filed a certain Verified Complaint (the "Complaint") against Kloeber, among others, initiating adversary proceeding number 11-06027 (the "Adversary Proceeding").  In the Complaint the Debtor also states that Kloeber "has attempted to assert control over Emlyn by claiming the ability to exercise voting and governance rights belonging to Mr. Montanari under a pledge of his membership interests in Emlyn." *See* Complaint ¶ 22.

28.     In addition, by the Complaint, the Debtor seeks, among other things, a declaration by this Court that "any pledge, hypothecation, or assignment to, or encumbrance in favor of Kloeber of any membership interest, governance rights, and/or financial rights in Emlyn is ineffective and void "and also declaring that the Purported Resolution allegedly "authorizing the filing of the Emlyn Case to be a valid act on behalf of Emlyn." *See* Complaint pp. 9-12.

29.     The Debtor, however, does not deny in the Complaint or other filings that Montanari and Kloeber entered into the Pledge Agreement.  The Debtor also does not deny in the Complaint or other filings that Montanari pledged all of his units and any other membership interests in and to the Debtor, representing one hundred percent of the aggregate membership units of the Debtor, to Kloeber.  Moreover, the Debtor does not deny that Kloeber exercised his

rights under the Pledge Agreement.[2]

30.    Instead, by filing the Complaint and seeking the relief requested therein, the Debtor, seemingly at the behest of Montanari, is attempting to convince this Court that its baseless interpretation of Minnesota state law should be followed by this Court, and that based upon the Debtor's unfounded interpretation of Minnesota state law this Court should find that Montanari's signing of the voluntary petition was authorized.

31.    Such an interpretation of Minnesota state law suggested in the Complaint appears to primarily benefit Montanari, rather than the Debtor, its estate or its creditors, by permitting Montanari to escape the bargained-for provisions set forth in the Loan Documents and the Pledge Agreement and in order to allow Montanari to retain his unfettered control of the Debtor.

32.    By filing the Complaint, the Debtor is ultimately attempting to convince this Court that an issue exists as to whether Montanari had authority to file the petition on behalf of the Debtor, when no such issue actually exits.  In fact, under Minnesota state law, despite the Debtors' unsubstantiated and confounding assertions otherwise, the Pledge Agreement, as well as the rights granted to Kloeber thereunder, is unquestionably valid and enforceable.

33.    The Pledge Agreement is a contract and as such, is subject to ordinary rules of construction.  Minnesota courts apply familiar standards when interpreting contracts.  "Where the terms of a contract are clear and unambiguous, there is no room for construction or interpretation." *Pierce v. Grand Army of the Republic*, 224 Minn. 248, 253, 28 N.W.2d 637, 640 (1947).  The fundamental approach in contract construction is to allow the intent of the parties to prevail.  *Turner v. Alpha Phi Sorority House*, 276 N.W. 2d 63 (Minn. 1979).  The intent of the contracting parties is to be ascertained, not by a process of dissection in which words or phrases

---

[2] The Debtor has attached a copy of the November 3rd Notice, together with a copy of the November 3rd Written Action, to its Complaint as "Exhibit C."

are isolated from their context, but rather, from a process of synthesis in which the words and

phrases are given a meaning in accordance with the obvious purpose of the contract as a whole.

*Ploog v. Ogilvie*, 309 N.W.2d 49 (Minn. 1981). Terms of a contract should be read together and

harmonized where possible. *Independent School Dist. v. Loberg Plumbing & Heating Co.*, 266

Minn. 426, 123 N.W.2d 793 (1963). Where the written language of a contract is clear, it is

neither necessary nor proper in construing the contract to go beyond the wording of the contract.

*Telex Corp. v. Data Products Corp.*, 271 Minn 288, 135 N.W.2d 681 (1965).

34.    Section 6 of the Pledge Agreement contains a clear expression of the parties'

agreement to allow Kloeber to exercise the governance rights of Montanari upon the occurrence

of an Event of Default. Under Minnesota law, this expression of the intent of the parties is not

subject to more than one reasonable interpretation and must be enforced as written.

35.    Despite the clear expression of intent embodied in the Pledge Agreement,

Montanari argues that he could not pledge or assign his governance rights as a member of the

Debtor without the consent of other members and accordingly, that Kloeber was barred from

exercising his contractual rights. This argument is specious, since it relies upon language in

Minnesota Statutes § 322B.313, Subd. 2 that is quite obviously inapplicable as applied to a single

member limited liability company. The statute states that "a member may, without the consent of

any other member, assign governance rights, in whole or in part, to another person already a

member at the time of the assignment" but that "any other assignment of any governance rights

is effective only if all the members, other than the member seeking to make the assignment

approve the assignment by unanimous written consent." Minn. Stat. § 322B.313, Subd. 2.

Montanari's argument requires this Court to assume that the Minnesota Legislature intended to

allow members in a multi-member limited liability company to freely assign their governance

rights to other members and to assign governance rights to third parties with the consent of the other members, but to disallow a single member from assigning his rights.  This is a tortured interpretation of the statute.

36.    Minnesota Statutes §§ 645.16 to 645.22 contain the statutory rules for construction of state statutes.   Minnesota Statutes § 645.16 contains the general rule that "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature."  The statute states that "[w]hen the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters: (1) the occasion and necessity for the law;  . . . (3) the mischief to be remedied; [and] (4) the object to be attained . . ."  Minn. Stat. § 645.16.  Here, it is obvious that the Minnesota Legislature intended to require a member of a multi-member limited liability company to obtain the consent of the other members before assigning or pledging governance rights to an outsider who could, via assignment, become a potentially unwelcome business partner of the non-assigning parties.  It is illogical to argue that the intent was to prevent the sole member of a limited liability company from freely assigning his interest.  Minn. Stat. § 645.17 states that "[i]n ascertaining the intention of the legislature the courts may be guided by the following presumptions: (1) the legislature does not intend a result that is absurd, impossible of execution, or unreasonable . . ."  "[W]e are required 'to read a particular [clause] in context with other [clauses] of the same statute in order to determine the meaning of the particular [clause]."  *Mavco, Inc v. Eggink*, 739 N.W. 2d 148, 153 (Minn. 2007), citing *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn.2005). Minnesota courts generally reject interpretations that render statutory language purposeless. *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000)

37.    The Debtor makes a disingenuous argument that the provisions of a Member

Control Agreement executed by Kloeber and Montanari when they were the only two members of the limited liability company remain effective and prohibit the pledge of his interest following the acquisition by Montanari of Kloeber's membership interest.  Pursuant to Minnesota Statutes § 322B.37, a member control agreement:

> ". . . may relate to, without limitation, the management of the limited liability company's business, the declaration and payment of distributions, the sharing of profits and losses, the election of governors or managers, the employment of members and others by the limited liability company, the relations among members and persons who have signed contribution agreements (including the termination of continued membership), the dissolution, termination, and liquidation of the limited liability company (including the continuation of the limited liability company's business through a successor organization or individual), and the arbitration of disputes."

The obvious purpose of a member control agreement is for multiple members to agree upon rules and restrictions applicable to their membership interest.  A prohibition against assignment inserted in a Member Control Agreement when the entity has multiple members has no practical purpose when one member becomes the sole member of the entity.

38.    The Pledge Agreement was executed as a part of a unitary transaction in which Kloeber financed the sale of his membership interest to Montanari.  On the same date, the parties entered into the Emlyn Coal Processing, LLC Membership Interest Purchase Agreement ("MIPA") *See* Exhibit E.  The MIPA contains a clause stating:

> "1.3  <u>Waiver of Certain Rights Arising under the Company Documents</u>.  To the extent necessary to effectuate the transfer of the Purchased Interest as contemplated by this Agreement, Purchaser and Seller waive any provisions of the Member Control Agreement and Operating Agreement of the Company, or similar agreements pertaining to the Company that would govern or restrict the transfer of a membership interest in the Company."

39.    There can be no disagreement that the parties intended to grant a fully effective security interest and that Montanari waived any right to claim that the pledge of his membership interest was barred by the Member Control Agreement. It is a fundamental principle of contract

interpretation that when several instruments are collectively executed as a part of one transaction, the instruments will be read together in order to determine intent, even if the terms do not refer to each other. *Cut Price Super Markets v. Kingpin Foods*, 256 Minn. 339, 98 N.W.2d 257 (1959); *Marso v. Mankato Clinic*, 278 Minn. 104, 153 N.W.2d 281 (1967); *Koch v. Han-Shire Inv.*, 273 Minn. 155, 140 N.W.2d 55 (1966). The clear intent of the parties was to allow Montanari to fully pledge his interest.

40.    In addition, on November 18, 2008, Montanari and Kloeber both executed that certain Emlyn Coal Processing, LLC Term Sheet with respect to Sale of Membership Interest from David N. Kloeber, Jr. to Bart Montanari. *See* Exhibit A.    The term sheet provides, among other things, that "[p]ursuant to board meeting held November 15, 2008 at the office of David N. Kloeber, Jr., the members of Emlyn Coal Processing, LLC agree to execute such documents necessary to formalize the agreed upon terms listed below." *See id.*  Among such terms listed in the term sheet, and expressly and unequivocally agreed upon by Montanari and Kloeber, is that: "All membership units of Emlyn shall be pledged as collateral for this transaction and shall remain in full force and effect until all obligations under this agreement are satisfied." *See id.* at ¶ 7.

41.    Accordingly, there should be no question that Montanari's pledge of his voting and other consensual rights under the Pledge Agreement is valid and enforceable under Minnesota state law, and that pursuant to Minnesota state law Kloeber was entitled to exercise those rights granted to him under the Pledge Agreement.

42.    However, despite Kloeber having validly exercised his rights under the Pledge Agreement in accordance with Minnesota state law, Montanari, in contravention of the Pledge Agreement and the rights granted to Kloeber thereunder, subsequently signed the voluntary

14

petition on behalf of the Debtor.  In addition, after Kloeber exercised his rights under the Pledge

Agreement in accordance with Minnesota state law, the Debtor subsequently filed the Purposed

Resolution with this Court.  The Purported Resolution is clearly of no effect since as of the

bankruptcy filing Montanari no longer served as Governor, officer and/or employee of the

Debtor, nor did Montanari possess any voting and or other consensual rights with respect to his

membership interest in the Debtor.

43.     Based upon the foregoing, this chapter 11 case was filed in bad faith, constituting

reason alone for this Court to dismiss the Debtor's chapter 11 case for "cause" under section

1112(b) of the Bankruptcy Code.

44.     Without waiving the foregoing, even assuming, *arguendo*, that this Court were to

find that the Debtor's and Montanari's acts did not constitute bad faith, the mere fact that the

Debtor did not have authority to file the voluntary petition also constitutes sufficient reason to

warrant dismissal of this chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code.  It

is axiomatic that the filing of a bankruptcy is a significant act that requires necessary and specific

authority. *In re Arkco Props., Inc.*, 207 B.R. 624, 627-28 (Bankr. E.D. Ark. 1997).

45.     In the absence of specific authority, numerous courts have dismissed chapter 11

cases under section 1112(b) of the Bankruptcy Code for cause. *See In re Real Homes, LLC*, 352

B.R. 221, 225 ("It is generally accepted that a bankruptcy case filed on behalf of an entity by one

without authority under state law to so act for that entity is improper and must be dismissed."); *In*

*re Avalon Hotel Partners, LLC*, 302 B.R. 377, 381 (Bankr. D. Or. 2003) (opining that an LLC's

bankruptcy petition filed without the requisite member approval required under the operating

agreement was unauthorized and must be dismissed); *In re Gen-Air Plumbing & Remodeling,*

*Inc.*, 208 B.R. 426, 430-31 (Bankr. N.D. Ill. 1997) (dismissing the chapter 11 case filed by a 50%

shareholder in violation of state law and the debtor's corporate charter and by-laws); *In re Arkco Props., Inc.*, 207 B.R. at 627-28 (Bankr. E.D. Ark. 1997) (dismissing chapter 11 case where petition filed without requisite corporate authority under corporate bylaws or state law).

46.     Limited liability companies, like corporations, are creatures of statute and cannot act for themselves.   Accordingly, it is well established that the authority of a corporation to commence a voluntary bankruptcy case is governed by applicable state law:

> The District Court in passing on petitions filed by corporations . . . must of course determine whether they are filed by those who have authority so to act. In absence of federal incorporation, that authority finds its source in local law. If the [court] finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition.

*Price v. Gurney*, 324 U.S. 100, 106 (1945).

47.     Recent cases continue to follow the Supreme Court's ruling in *Price v. Gurney*. *See Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) (state law controls who may file a corporate debtor for bankruptcy, in the absence of authority, the petition must be dismissed); *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1258 (8th Cir. 1994) ("[a] person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law"); *In re Yellow Cab Coop. Ass'n*, 144 B.R. 505, 509 (D. Colo. 1992) (finding that cases decided under the Bankruptcy Code look to state law and instruments of incorporation to determine whether a petition is filed with the proper corporate authority); *Skulsky v. Nyack Autopartstores Holding Co. (In re Nyack Autopartstores Holding Co.)*, 98 B.R. 659, 663 (Bankr. S.D.N.Y. 1989) ("The authority of a corporation to file a bankruptcy petition is left to those in the corporation who have the power of management. State law will govern as to who may exercise the power of management.") (internal citations omitted); *In re Moni-Stat, Inc.*, 84 B.R. 756 (Bankr. D. Kan. 1988) (concluding that a director with a 50%

interest did not have the necessary authority to file a bankruptcy petition where both state law and the articles of incorporation required a majority of the board to act).

48.     The holding of *Price v. Gurney* has been extended to other state-law created entities, including partnerships and limited liability companies. *See Philips v. First City, Texas-Tyler, N.A. (In re Philips)*, 966 F.2d 926, 934 (5th Cir. 1992) ("Throughout the many revisions to federal bankruptcy law, courts continue to resolve authority-to-file disputes according to state law. . . . Without further direction from Congress, we will continue to look to state law to determine which people have authority to seek federal bankruptcy protection on behalf of state created business entities."); *In re Century/ML Cable Ventur*e, 294 B.R. 9, 24 (Bankr. S.D.N.Y. 2003) ("[T]he matter of authority to file is one of substantive law beyond the scope of the Bankruptcy rules. . . . The Court believes that it must look instead to the contractual provisions, and statutory law"); *In re Avalon Hotel P'ners., LLC*, 302 B.R. at 380 ("[W]hether a business entity properly is authorized to file a bankruptcy petition is a matter determined under state law").

49.     Despite the Debtor's attempts to convince this Court otherwise, Montanari did not possess the requisite authority under applicable Minnesota state law to sign the voluntary petition on behalf of the Debtor, and no issues of fact exist to prevent this Court from making a determination with respect to this issue at this time.

50.     The point of contention raised by the Debtor with respect to the Pledge Agreement appears to solely be an issue of law, as to whether the provisions of the Pledge Agreement were valid and enforceable under Minnesota state law.   The Debtor does not contest that Montanari and Kloeber entered into the Pledge Agreement, that an Event of Default occurred under the Pledge Agreement or that Kloeber exercised his rights under the Pledge

Agreement.

51.     Given that the Pledge Agreement is valid and enforceable under applicable state law, and further given Kloeber's pre-petition exercise of his rights under section 6 of the Pledge Agreement to terminate all of Montanari's rights to exercise or to refrain from exercising voting and other consensual rights under the Pledge Agreement and the termination of Montanari as Governor, officer and employee of the Debtor, Montanari has no basis to claim that he possessed the authority to sign the voluntary petition on behalf of the Debtor. *See In re The Odyssey Group, Inc.*, 1992 WL 315106 (Bankr. S.D. Ohio 1992) (finding that dismissal of the case was warranted because the creditor properly exercised rights under a stock pledge agreement prior to the filing of the petition, and thus, the action taken by the former officer of the debtors in executing and filing the petition was contrary and in violation of the stock pledge agreement).

52.     For the reasons set forth above, among others, Kloeber respectfully requests that this Court enter an order pursuant to section 1112(b) of the Bankruptcy Code dismissing the Debtor's chapter 11 case.

**B.      In the Alternative, a Chapter 11 Trustee Should Be Appointed in Order to Protect and Preserve the Debtor's Assets**

53.     Section 1104(a) of the Bankruptcy Code provides, in pertinent part:

(a)     At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order appointment of a trustee –

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

(2) if such appointment is in the interests of creditors, any equity

security holders, and other interests of the estate, without regard to the
number of holders of securities of the debtor or the amount of assets or
liabilities of the debtor; or

(3) if grounds exists to convert or dismiss the case under section
1112, but the court determines that the appointment of a trustee or an
examiner is in the best interest of the creditors and the estate.

11 U.S.C. § 1104(a).

54.    Although there is a strong presumption in chapter 11 cases that the debtor-in-
possession should be permitted to remain in control of the debtor corporation, *In re Marvel
Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998), where cause exists, it is
nevertheless appropriate for the court to appoint a trustee in order to preserve the integrity of the
bankruptcy process and to ensure that the interests of creditors are served.  *In re Intercat, Inc.*,
247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) (citations omitted).

55.    "Under 11 U.S.C. § 1104(a)(1), if cause is found, appointment of a Chapter 11
Trustee is mandatory.  Cause includes fraud, dishonesty, incompetence, gross mismanagement,
or similar actions.  Factors that have been considered include materiality of misconduct,
evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other
creditors, the existence of pre-petition voidable preferences or fraudulent conveyances,
unwillingness or inability of the debtor-in-possession to pursue estate causes of action, conflicts
of interest on the part of the debtor-in-possession interfering with its ability to fulfill fiduciary
duties, and self-dealing or squandering of estate assets.  A court may consider both the pre-and
post-petition misconduct of the current management when making a determination that 'cause'
exists for the appointment of a Chapter 11 Trustee." *In re Daily*, No. 309-05337, 2009 WL
3415204, at *3 (Bankr. M.D. Tenn. Oct. 19, 2009) (internal citations omitted).

56.    Courts have also found "cause" for the appointment of a chapter 11 trustee to

exist where there is a significant number of conflicts of interest between the debtor and its management. *Marvel*, 140 F.3d at 472; *see, e.g.*, *In re SunCruz Casinos, LLC*, 298 B.R. 821, 831 (Bankr. S.D. Fla 2003) ("cause" existed for the appointment of a Chapter 11 trustee based upon the sheer number of conflicts of interest of the debtor's management, as holding multimillion dollar claims, as the sole shareholder of a corporation which conducted business with the debtor and as a defendant in a substantial cause of action belonging to the debtor); *In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. W. Va. 1980) (The magnitude of the number of inter-company transactions places current management of the debtor in a position of having grave potential conflicts of interest and the presumption arises that the current management of debtor will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of debtor); *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir.1988) (The Court held that a history of transactions with affiliated companies could constitute "cause" for the appointment of a trustee and held that once the court ruled that cause existed under section 1104 of the Bankruptcy Code, it had no discretion but to appoint a trustee).

57.     In addition, when determining whether "cause" exists for the appointment of a Chapter 11 Trustee, courts should also consider any commingling of the Debtor's affairs with affiliated companies and whether the current management lacks the discipline to institute fiscal and managerial controls necessary for the reorganization. *In re La Sherene, Inc.*, 3 B.R. 169, 175 (Bankr. N.D. Ga. 1980). In such instances, the appointment of a trustee may be appropriate irrespective of the talents current management may bring to the case. *Id*.

58.     In the present matter, "cause" exists for the appointment of a Chapter 11 Trustee.

59.     Upon information and belief, Montanari has been involved in misconduct in dealing with his past business relations, which leads one to question whether it is in the best

interest of the Debtor, its estate and creditors for Montanari to continue to retain control over the Debtor and its operations.  Upon information and belief, Montanari has a history of tax liens and foreclosures with respect to his prior failed businesses.

60.     Montanari has also proven himself to be unsuccessful in operating the Debtor, specifically, and the coal business to the benefit of the Debtor's creditors.  There are currently three lawsuits pending, either individually or collectively, against the Debtor and its affiliated debtor Montie's Resources, LLC ("Montie's"), in addition to Kloeber's complaint to collect over $12 million.  There are tax liens outstanding, unemployment claims and a host of evidence demonstrating Montanari's inability to operate the Debtor and the coal business.

61.     Since Montanari took complete control of the Debtor in January 2009, he has failed to properly manage the Debtor and operate the Debtor's business.  Under the Loan Documents, the Debtor has been required to provide Kloeber with monthly financial statements and such financial statements have caused Kloeber great concern with respect to Montanari's failure to properly manage the Debtor and its affairs.

62.     Among other things, the financial statements provided by the Debtor, under the management and control of Montanari, were not fully reconcilable in many instances.[3]  For example, many times the amounts of coal inventory, versus the coal that had been mined and the coal that had been sold by the Debtor were irreconcilable.

63.     In addition, the financial statements provided by the Debtor, under the management and control of Montanari, on many occasions indicated large equity balances for loans made to member(s) and/or an exorbitant salary being paid to Montanari, as well as indicating the frequent payment by the Debtor of presumably personal expenses on behalf of

---

[3] Kloeber attempted on numerous occasions to raise with the Debtor's management the concerns with respect to the financial statements and other concerns, as discussed herein.

Montanari.

64.    Upon information and belief, Montanari has consistently received payments of approximately $50,000 per month from the Debtor pre-petition.  In addition to such payments made by the Debtor to Montanari, upon information and belief, the Debtor has historically also made certain payments to other entities or parties affiliated with Montanari.  At the same time, however, payments were not being made to Kloeber under the Loan Documents and the Debtor appeared to have delinquent accounts payable to other creditors (and even delinquent trust fund taxes).

65.    Even during this chapter 11 case, the Debtor has proposed as part of the cash collateral budget to pay a salary to Montanari of $7,500 per week, which would equal $390,000 on an annual basis. *See* Cash Collateral Motion, Exhibit A.  At the same time, as part of the cash collateral budget, the Debtor proposes to pay adequate protection payments to the five cash collateral creditors in the aggregate amount of $7,500 per week, beginning in the third week after the Petition Date. *See id*.

66.    Such payments made by the Debtor to Montanari and his affiliated entities and parties clearly demonstrate Montanari's self-dealing and squandering of estate assets.  In addition, the substantial amount of payments, which upon information and belief, have been made by the Debtor to Montanari and his affiliated entities also evidence that Montanari is faced with a number of significant and irreconcilable conflicts of interest.

67.    It would be unreasonable to expect that the Debtor, under the control of Montanari, would undertake any meaningful investigation or make any effort to recover such potentially significant assets of the Debtor's bankruptcy estate from Montanari himself or any of his affiliated entities or parties.  Moreover, the foregoing demonstrates that there has been gross

mismanagement of the Debtor leading up to the filing of this chapter 11 case.

68.     In addition, as evidenced by the filings in the Debtor's chapter 11 case and the chapter 11 case of the Debtor's affiliate, Montie's, the Debtor's management also appears to have been commingling the Debtor's affairs with that of Montie's.   As way of example, upon information and belief, a certain lease was entered into with Fountain Leasing by Montie's under the name of "Montie's Resources, LLC d/b/a Emlyn Coal Processing, LLC".  Further, although upon information and belief, Montie's, which previously engaged in mining coal, no longer operates and was shut down due in part to the failure to pay federal withholding taxes of approximately $500,000, Montanari himself admits that "Emlyn actively mines high quality coal at the Corn Creek mine *owned by Monties* in Woodbine, Kentucky and the Swan Pond mine in Owsley, Kentucky." *See Affidavit of Bartolomea Mantanari in Support of Chapter 11 Petitions* (the "<u>First Day Affidavit</u>") (Docket No. 12) (emphasis added).

69.     Based upon the foregoing, among other reasons, "cause" exists for the appointment of a Chapter 11 Trustee under section 1104(a)(1) of the Bankruptcy Code.

70.     In addition, appointment of a Chapter 11 Trustee is in the interests of creditors under section 1104(a)(2) of the Bankruptcy Code.  In determining whether the appointment of a trustee "is in the interest of creditors" under section 1104(a)(2) of the Bankruptcy Code, courts look to the practical realities and necessities of the case. *In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr. W.D. Pa. 1988), subsequently aff'd, 871 F.2d 1217 (3d Cir. 1989); *In re Ridgemour Meyer Props., LLC, 413 B.R. 101, 112 (Bankr. S.D.N.Y 2008)* (citations omitted).

71.     Unlike section 1104(a)(1) of the Bankruptcy Code, section 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no "cause" exists. *Marvel*, at 474.  "Under this subsection, the Court may utilize its broad equitable powers to engage in a

cost-benefit analysis in order to determine whether the appointment of a trustee is in the best interest of the creditors, equity holders, and other interests of the estate." *Daily*, 2009 WL 3415204, at *5 (citing *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1985)).

72.     Among factors considered by the courts are (i) the trustworthiness of the debtor, (ii) the debtor in possession's past and present performance and the prospects of rehabilitation, (iii) the confidence – or lack thereof – of the business community and the creditors in present management and (iv) the benefits derived by the appointment of a trustee measured against the cost of the appointment. *Ridgemour*, 413 B.R. at 112.

73.     In the present matter, the Debtor's management has not proven to be trustworthy or dependable. To the contrary, as discussed above, the Debtor's management has gone to extensive lengths to retain control over the Debtor, to the detriment of the Debtor's estate and creditors.  In addition, upon information and belief, the Debtor's management has paid itself significant sums pre-petition, while neglecting to pay creditors over the same period of time.

74.     The Debtor's business operations have continued to perform poorly since current management took control over the Debtor, and despite current management's unsupported projections of how they expect the Debtor will perform throughout the pendency of this chapter 11 case, the past history of the Debtor clearly does not substantiate such projections.

75.     As discussed above, due to, among other things, the Debtor's poor history of performance, failure by management to properly operate the Debtor and perceived inclination of management to pay itself prior to the Debtor's creditors, creditors appear to generally have a lack of confidence in the Debtor's present management.

76.     Accordingly, the appointment of a Chapter 11 Trustee will provide a significant

benefit to the Debtor, the Debtor's estate and creditors, by permitting an independent Chapter 11 Trustee to conduct the affairs of the Debtor.  Such benefits derived from appointment of a Chapter 11 Trustee appear to be substantially greater than any costs that would be incurred with the appointment of a Chapter 11 Trustee, especially taking into consideration the significant amounts that would be saved by the Debtor from not paying a member salary of $7,500 per week, which is the amount that the Debtor has proposed to pay Montanari pursuant to the Cash Collateral Motion.

77.      To the extent this Court denies Kloeber's requested relief to dismiss this chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code, Kloeber submits that sufficient "cause" exists to warrant appointing a Chapter 11 Trustee in this case pursuant to section 1104(a) of the Bankruptcy Code.[4]

WHEREFORE, Kloeber respectfully requests that this Court enter an order: (i) dismissing the Debtor's chapter 11 case under section 1112(b) of the Bankruptcy Code, or alternatively, (ii) appointing a Chapter 11 Trustee in this case pursuant to section 1104(a) of the Bankruptcy Code, and (iii) granting to Kloeber such other and further relief as may be appropriate under the circumstances.

---

[4] To the extent that this Court denies Kloeber's requested relief with respect to dismissal of this chapter 11 case, however, proceeds with respect to the requested relief regarding appointment of a Chapter 11 Trustee, Kloeber respectfully requests that this Court set an evidentiary hearing with respect to such request to appoint a Chapter 11 Trustee at a later date and Kloeber will present evidence in further support of the requested relief with respect to the appointment of a Chapter 11 Trustee at or prior to such evidentiary hearing, in accordance with any applicable Bankruptcy Rules and local bankruptcy rules.

Dated: November 8, 2011                    Respectfully submitted,

                                           FROST BROWN TODD LLC


                                            */s/ Patricia K. Burgess*
                                           Patricia K. Burgess, Esq.
                                           250 West Main Street, Suite 2800
                                           Lexington, Kentucky 40507
                                           Tel: (859) 231-0000
                                           Fax: (859) 231-0011
                                           E-mail: pburgess@fbtlaw.com

                                           *Counsel for David N. Kloeber, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was served on the 8th day of November, 2011 to the following parties via first class mail, postage prepaid and e-mail, where such e-mail address is provided, and all the parties served by the Court via CM/ECF noticing:

Dean A. Langdon
J. Wesley Harned
DelCotto Law Group PLLC
200 N Upper St
Lexington, KY 40507
**Email: dlangdon@dlgfirm.com**
**Email: wharned@dlgfirm.com**

Gregory A. Napier
Troutman & Napier, PLLC
4740 Firebrook Blvd.
Lexington, KY 40513
(859) 253-0991
**Email: gnapier@troutmannapier.com**

Philip Hanrahan
100 E. Vine St. #500
Lexington, KY 40507
(859) 233-2822
**Email: philip.l.hanrahan@usdoj.gov**

Emlyn Coal Processing LLC
4184 South Hwy. 25 W
Williamsburg, KY 40769

AA Financial Services
P O Box 1806
Ann Arbor, MI 48106

Toyota Financial Services
P O Box 8026
Cedar Rapids, IA 52409-8026

Commonwealth of Kentucky
Office of Employment and Training
Division of Unemployment Insurance
P O Box 498
Frankfort, KY 40602-0948

GBG Financial, LLC
250 West 34th St.
New York NY 10119

Globe BG LLC
Globe Specialty Metals
GVG Financials, LLC
c/o Kevin M. McGuire, Esq.
Jackson Kelly PLLC
P O Box 2150
Lexington KY 40588-9945

Emeco
300 Emeco Way
London KY 40741
Hinkle Contracting Corporation
P O Box 200
Paris KY 40362

Whayne Supply
c/o Jerred P. Roth, Esq.
300 W. Vine St. Suite 600
Lexington KY 40507-1660

Kentucky Dept. of Revenue
Legal Branch - Bankruptcy Section
P O Box 5222
Frankfort KY 40602
**VIA EMAIL: barbara.kenney@ky.gov**

Internal Revenue Service
P.O. Box 7346
Philadelphia PA 19101-7346

Tennessee State Treasurer
Tennessee State Capitol, 1st Floor
600 Charlotte Avenue
Nashville, TN 37243-0225
**VIA EMAIL: blake.fontenay@tn.gov**

Office of Surface Mining
P O Box 979068
St. Louis, MO 63197-9000

BB&T Bank
1390 Master Street
Corbin KY 40701

Canada Brothers Auto Parts
504 Main Street
Williamsburg KY 40769

Card Member Services
PO Box 790408
St. Louis MO 63179-0408

Cook & Cheek CPA
302 Falls St
London KY 40741

Dale Greer and Deborah Greer
c/o Jason E. Williams, Esq.
P O Box 3199
London KY 40743-3199

Dept. of Natural Resources
Office of Adminstrative Hearings
35-36 Fountain Place
Frankfort KY 40601

First Insurance Funding
PO Box 66468
Chicago IL 60666-0468

Frattalone Mining
3205 Spruce St
Little Canada MN 55117

Hellmuth & Johnson
8050 W 78th St
Edina MN 55439

Ikerd Mining
521 Crane Rd
Somerset KY 42501

Kentucky Unemployment Ins Fund
250 W. Main Street
Suite 900
Lexington KY 40507

Mine Safety and Health Administration
P O Box 790390
Saint Louis MO 63179-0390

Progressive Financial Services
PO Box 24216
Tempe AZ 85285

RT Welding/Fabrication
PO Box 1686
Harlan KY 40831

Sears, Ivel Keith and Patricia
c/o Stephen M. Jones, Esq.
P O Box 604
London KY 40743

Straight Creek, LLC
4060 Randall Farm Road
Atlanta GA 30339

Fountain Leasing
P O Box 51768
Knoxville, TN 37950

Straight Creek Leasing
3350 Riverwood Pkwy.
Suite 1900
Atlanta, GA 30339


/s/ Patricia K. Burgess
_____

*Counsel for David N. Kloeber, Jr.*

CINLibrary 8082566.0570731 2067699v1